**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 92-2062** |
| | ) | |
| **STATE OF TENNESSEE** et al., | ) | |
| | ) | |
| **Defendants, and** | ) | |
| | ) | |
| **PEOPLE FIRST OF TENNESSEE and** | ) | |
| **PARENT-GUARDIAN ASSOCIATION** | ) | |
| **OF ARLINGTON DEVELOPMENTAL** | ) | |
| **CENTER,** | ) | |
| | ) | |
| **Intervenors.** | ) | |

**MEMORANDUM OPINION**

On September 30, 2009, the Court granted the motion of Defendants State of Tennessee et al. for leave to terminate the State of Tennessee's contract with the Community Services Network of West Tennessee, Inc. The Court now issues this memorandum opinion setting forth the reasons for its decision.

**I. PROCEDURAL BACKGROUND**

**A. General Procedural Background**

On January 21, 1992, acting pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 et seq., Plaintiff United States of America ("United States") filed suit against Defendants State of Tennessee and various State officials ("State" or "Defendants")[1] concerning conditions at Arlington Developmental Center ("ADC"), a State-run intermediate care facility for

---

[1] The term "Defendants" as used in this opinion does not include the defendant-intervenor, the Parent Guardian Association.

mentally retarded individuals ("ICF/MR").  ADC's "population consists primarily of individuals currently assessed as severely or profoundly retarded or developmentally disabled, some of whom have associated physical handicaps, and mental or behavioral problems." <u>United States v. State of Tennessee</u>, 925 F. Supp. 1292, 1296 (W.D. Tenn. 1995).  In 1993, after a trial that took place over the course of two months, the Court found that conditions at ADC violated the constitutional rights of its residents.  Since the Court's ruling in 1993, this litigation has focused on finding and implementing an appropriate remedy. In 1994, the Court entered the Remedial Order negotiated by the United States and the State, which provides for closure of admissions to ADC, improved services to ADC residents, and the transitioning of ADC residents to community placements.  Alternative means of delivering necessary care and services to mentally retarded individuals in West Tennessee would replace ADC.

In 1995, the Court allowed People First of Tennessee ("People First") to intervene as plaintiffs, certified a plaintiff class comprising past, present, and future ADC residents, and designated People First as the representative of the plaintiff class.  The Court further allowed the Parent Guardian Association ("PGA") to intervene as a defendant intervenor.  The Court approved the Community Plan for placing ADC residents into appropriate community placements in 1997.  Currently, ADC remains open, though with a reduced number of residents.

**B. Procedural Background Related to the Creation of CSN**

Since 1994, the Court has held the State in contempt on four separate occasions.  One such finding of contempt occurred in 1999 and resulted from the State's failure to provide adequate services to class members in community placements—a responsibility at that time assigned to the State's Bureau of TennCare.  Thereafter, discussions began to focus on the question of how best to provide adequate and appropriate health care services to plaintiff class

members.  These negotiations eventually led to the creation of the Community Services Network of West Tennessee, Inc. ("CSN"), a nonprofit entity through which the State would provide a host of services outside of TennCare.  After some dispute among the parties regarding the details of CSN's services and its intended service population, the Court ordered the State to execute a contract with CSN by April 15, 2000.  On April 12, 2000, the State complied, executing the Grant Contract with CSN, which the State has consistently renewed.

On April 8, 2009, Defendants filed a motion seeking leave to terminate the State's contract with CSN.  People First originally filed a response in opposition to the motion, but later entered into discussions and a Settlement Agreement which addressed People First's initial concerns.  People First then joined in support of Defendants' motion.  The United States has continuously opposed Defendants' motion.  The Court heard testimony and received other evidence on the motion from August 24 to 27, 2009 and issued its order granting Defendants' motion on September 30, 2009.

## II. FINDINGS OF FACT

### A. State Funding of CSN as an Interim Measure

As previously noted, in 1999 the Court found the State in contempt and ordered the State to provide, through State dollars, health services to plaintiff class members not covered by the State's existing Medicaid waivers.  (See Agreed Order of Aug. 11, 1999.)  The Court's order that health services be provided solely at State expense was not intended to be a permanent solution.  Rather, sole reliance upon State funds was intended to continue only until the State could obtain and implement a waiver-based vehicle that would qualify for federal funds.  (Id. at 2.)  Thus,

CSN came into existence with the expectation that it would administer a new health services waiver for plaintiff class members.[2]

The State, however, was never able to obtain the waiver that CSN was to administer. Blocking the State's efforts to obtain the waiver were requirements imposed by the Center for Medicare and Medicaid Services[3] ("CMS"). (Ex. 98: Tomlinson Depo. at 7-17.) CMS took the position that Medicaid programs must be administered by a single state agency—in this case, the Bureau of TennCare—and that there was no practical legal mechanism in federal law to permit an intergovernmental cooperative arrangement between state agencies. Therefore, it was not possible for CSN to administer a waiver for health-related services outside of TennCare. As a consequence, CSN's services are not and have never been eligible for federal matching funds, known as federal financial participation, except for a small percentage (about five percent) of its funding for the provision of certain therapies. (Tr. 760-61.) Moreover, CSN is primary to TennCare, and thus the federal matching funds that would be received were TennCare to provide a service for a class member are lost when CSN instead provides the service. (Tr. 826-27.)

In the absence of a waiver for CSN, the Court in 2000 ordered the State to contract with CSN to provide those services to plaintiff class members that they would have received had the State obtained a waiver as originally planned. (See Order of April 5, 2000.) It was at this time that the State executed the Grant Contract with CSN. The Grant Contract expressly states that the "services provided under this Grant Contract shall continue to be funded in accordance with the terms of the Grant Contract until provisions for such services are appropriately provided for under a new funding vehicle acceptable to the Court." (Grant Contract at 2.)

---

[2] This new waiver was to have existed apart from the already existing TennCare Medicaid waiver and the home- and community-based waivers.
[3] Formerly known as the Health Care Financing Administration, CMS is a federal agency within the United States Department of Health and Human Services.

**B. Provision of Services through the Waivers and CSN**

Under the existing scheme, the State provides physical and behavioral health services to Medicaid enrollees, including the members of the plaintiff class, through the State's main Medicaid waiver, known as the Section 1115 waiver.  (Tr. 68.)  This waiver operates through a managed care system, and a managed care organization ("MCO") provides each enrollee with a primary care physician.  (Tr. 68-69.)  Further, the State administers home- and community-based services waivers ("MR waivers"), also known as Section 1915(c) waivers, which provide additional services for TennCare enrollees with intellectual disabilities.  (Tr. 69-72.)  Nearly 8,000 persons with intellectual disabilities throughout Tennessee receive services through MR waivers, including 600 to 700 members of the plaintiff class.  (Tr. 20, 73, 616-17.)  While the Section 1115 waiver provides medical services, the Section 1915(c) or MR waivers provide persons with intellectual disabilities assistance in their daily living.  (Tr. 69-72.)  In addition to receiving services through these waivers, plaintiff class members receive services through CSN, which are coordinated by a nurse case manager (Tr. 73-74), and also have an independent support coordinator (Tr. 75).  Individuals enrolled in the waivers who are not served through CSN do not currently receive the support of nurse case managers.  (Tr. 74-75, 616-17.)  State officials believe that the current system, which results in a provision of services which are not coordinated, is inefficient and can be greatly improved.  (Tr. 612-13.)

For the fiscal year beginning July 1, 2009, CSN's budget is $19.86 million, $17.50 million of which the State would be responsible for covering out of its own funds absent leave to terminate its contract with CSN.  (Tr. 31; Ex. 78.)  The State proposes to replace CSN with a TennCare contractor eligible for federal matching funds.  (Tr. 31.)  Replacing CSN with a TennCare contractor will result in federal matching funds covering roughly seventy-five percent

of the expenditures for services currently provided by CSN. (Tr. 31.) The State's expenditures will accordingly drop to $4.95 million, and the State will thereby save $12.55 million per year. (Tr. 31-32.) The State plans to apply this savings in such a way as to generate additional federal matching funds. (Tr. 35.) Ultimately, the State projects that it will receive $37.83 million per year in additional federal matching funds by availing itself of federal financial participation. (Tr. 35; Ex. 78.)

With those additional funds the State proposes to establish the Integrated Health Services Delivery Model for Persons with Intellectual Disabilities, which will serve all persons with intellectual disabilities across Tennessee who are receiving State services. (Tr. 42, 81, 616-17.) State officials contend that access to federal matching funds is particularly desirable in light of the State's current budget shortfall[4] and the State's obligation to balance its budget, which could otherwise necessitate further reductions in the State's expenditures for services to persons with intellectual disabilities. (Tr. 36-38; Ex. 79.)

**C. The State's Proposal**

The centerpiece of the State's proposal is the creation of the Integrated Health Services Delivery Model for Persons with Intellectual Disabilities ("the Model"). (Ex. 86.) The Model will serve all of the roughly 8,000 individuals in Tennessee with intellectual disabilities, including the members of the plaintiff class. (Tr. 80.) The State estimates that the cost of the Model will not exceed $25 million per year, an amount sufficiently low that it can be covered out of the additional funds to be derived from replacement of CSN. (Tr. 42.) Without termination of the contract with CSN, the State will not have sufficient funding to implement the Model. (Tr. 80-81; see Tr. 617-18.)

---

[4] Between August 2008 and July 2009, the State incurred a shortfall of $1.1 billion in collections of revenue to the general fund. (Tr. 39.)

All individuals to be served by the Model will be assigned a nurse care manager who will be a registered nurse and possess additional training in working with individuals possessing intellectual disabilities.[5]  (Tr. 79, 289-90, 302.)  The nurse care manager, although provided by an MCO, will be responsible for coordinating services irrespective of whether those services would come through the MCO or the waiver.  (Tr. 86.)  The nurse care manager will further coordinate care with the individual's primary care physician and will facilitate the receipt of waiver services with the individual's independent support coordinator.  (Tr. 86-87.)

Volunteer State Health Plan ("VSHP"), a subsidiary of BlueCross BlueShield of Tennessee and a current MCO contractor for the State, will implement the Model through an amendment to the State's existing contract with VSHP.  (Tr. 236-37.)  Under the contract amendment, VSHP will employ the nurse care managers and otherwise be responsible for the implementation and operation of the Model.  (Tr. 87-88.)  Recognizing that they already possess valuable knowledge of the needs of individual class members, VSHP will attempt to recruit those existing CSN nurse case managers who possess the requisite credentials to serve as nurse care managers in the Model.  (Tr. 95-96, 300-01.)

VSHP is experienced in providing services to individuals with intellectual disabilities. Specifically, VSHP already administers TennCare Select, a managed care program for thousands of children in state custody, many of whom have special needs and intellectual disabilities. (Tr. 279-80.)  VSHP, like TennCare, similarly possesses recent experience in transitioning mentally retarded and other individuals with special needs between insurance plans.  (Tr. 279, 533-36.)

VSHP will enable enrollees to have access to 18,000 medical providers, including primary care physicians and specialty providers, across Tennessee.  (Tr. 96.)  VSHP has also

---

[5] As stated above, currently only those enrolled in CSN receive the support of someone like the proposed nurse care manager.

successfully complied with the State's requirement of ensuring that enrollees are able to timely obtain medical appointments—within 21 days for a primary care physicians and 30 days for a specialist, within 48 hours for urgent needs, and immediately for emergencies. (Tr. 515-18.) VSHP has a plan for the active recruitment of those medical providers who currently serve class members through CSN but who are not part of VSHP's current network, including the payment of an additional per member per month fee to the provider, if necessary.[6] (Tr. 95-96, 519-20.)

Furthermore, VSHP is able to apply several innovative technologies to enhance the overall level of care that participants receive. One such technology, GeoAccess mapping software, is employed to ensure that VSHP meets its requirement of having a primary care physician within thirty minutes or thirty miles of every enrollee, as well as having specialists within sixty minutes or sixty miles of every enrollee. (Tr. 515-17.) Other technologies whose use VSHP envisions include an electronic visit verification system that will monitor visits and services in real time to prevent gaps in services; MCSource, which will enable nurse case managers and providers to have access to electronic versions of enrollee's medical records; and MEDai, software that assists in identifying deviations from best practices in the treatment of an individual's particular diagnoses. (Tr. 296-300.)

**D. Class Members' Benefits**

Witnesses for the State—including TennCare's Chief Medical Officer, Wendy Long, M.D., and Patti Killingsworth, TennCare's Director of Long Term Care—credibly testified that the package of benefits and services to be provided to class members will be adequate and appropriate to meet the needs presented by the members of the plaintiff class. Class members

---

[6] According to data from the State, sixty-five percent of providers to CSN over the last year are already in the VSHP network. (Tr. 527-29.) Another twenty-three percent of CSN providers over the last year have had contact with the VSHP system as out-of-network providers. (Tr. 528.) It also appears that of the fifty-eight CSN providers who administered services to CSN participants over the last year but who have had no contact with VSHP, many, if not most, do not regularly serve class members. (Tr. 528-29.)

will receive services under both the TennCare Section 1115 waiver and the Arlington MR waiver.  (Tr. 112, 540-41.)

Transitioning from CSN will, however, result in some modest changes to the medications that will be covered.  These changes will principally occur in two areas: (1) barbiturates and benzodiazepines; and (2) over-the-counter medications.  (Tr. 112-14, 543-44.)  Neither TennCare nor the MR waivers covers barbiturates and benzodiazepines because the State, following the lead of the federal government, has determined that they are not the most effective medications available, that alternative medications exist for treatment of the same conditions, and that use of barbiturates and benzodiazepines poses the risk of serious side effects.  (Tr. 545-47.)  TennCare previously transitioned hundreds, possibly thousands, of TennCare enrollees from these medications when it discontinued coverage of barbiturates and benzodiazepines in January 2006. (Tr. 547-49.)  The State intends to follow the same process for transitioning class members.  (Tr. 549.)  The State does not cover over-the-counter medications because these drugs are relatively inexpensive and many—such as cough and cold medications—are considered ineffective.  (Tr. 550-51.)  Furthermore, where medically necessary, there exist covered prescription alternatives. (Tr. 579-80.)

Dr. Long performed a thorough analysis of the prescriptions CSN covered over the last year and opined that the State's package of benefits would provide class members enrolled in the plan adequate and appropriate health care services.  (Tr. 540-41, 569-81.)  The overwhelming majority of the medications that will not be covered are over-the-counter drugs.  (Tr. 575-76.) Of the fifty-two that were prescription medications, thirty-two have alternative covered prescription medications, fifteen are cough and cold medications, three are for smoking

cessation, one is a cosmetic drug, and one has been withdrawn from the market because of safety concerns.[7]  (Tr. 572-79.)

Accordingly, the Court finds that the transition from CSN will not result in the loss of any medications that have been shown to be necessary to the maintenance of any member's well-being.  Either covered alternative medications exist to which the member can be transitioned, or, as in the case of over-the-counter drugs, the individual class member can be reasonably expected to incur the extra financial cost should a covered prescription alternative to the over-the-counter drug not exist.

**E. Medical Necessity Review**

In evaluating the State's proposal, the Court must be satisfied that class members will not suffer the loss of necessary medical treatment and services, given that VSHP will not automatically cover all medical procedures recommended by a treating medical professional  (Tr. 513).  For certain procedures that are either very expensive or for which there is a fair amount of inappropriate use, the treating physician must explain why the service is medically necessary. (Tr. 513-14.)  The nurse care manager must review the request for prior authorization and grant authorization if the request complies with VSHP's written criteria.  (Tr. 515, 595-96.)  If the nurse care manager has concerns about its medical necessity, the request must be referred for review to a VSHP medical director, a physician who may grant or deny the request after consultation with the treating physician.  (Tr. 596-98.)

If VSHP denies the request, the patient may appeal and receive consideration by a different VSHP medical director, also a physician.  (Tr. 598-99.)  That physician may grant the request.  (Tr. 599-600.)  Should this second medical director also deem the procedure not

---

[7] Certain other benefits, such as nutritional supplements, may not be covered through VSHP but are available through the waiver.  (Tr. 225-27.)

medically necessary, the request is to be reviewed by a third physician, a doctor independent of TennCare and VSHP, who has the authority to grant the request. (Tr. 600-01.) If this third physician finds that the procedure is not medically necessary as well, the matter proceeds to a hearing before an administrative law judge. (Tr. 601-02.)

The Court is satisfied that these procedures, which are governed by the consent decree entered by the U.S. District Court for the Middle District of Tennessee in the Grier case (Tr. 602-03), suffice to prevent the erroneous denial of medically necessary treatment and services and provide appropriate due process.

**F. Quality Assurance**

The National Committee on Quality Assurance ("NCQA") sets national standards for MCO's and evaluates MCO's based on a number of criteria. (Tr. 89, 240-41, 500.) VSHP is not only accredited by NCQA, but also possesses an NCQA rating of "excellent"—the highest possible NCQA rating. (Tr. 240.) CSN is not accredited by NCQA. (Tr. 717.) Furthermore, because VSHP compiles so-called "HEDIS" data sets, the State is able to independently assess its performance. (Tr. 100-01, 240-41, 502-03.) VSHP is also subject to review through a standardized survey of enrollees and monitoring by an external quality review organization. (Tr. 503-05.)

Some of the proof suggested that VSHP might have a financial incentive to limit or deny medically necessary services. (Tr. 255-56.) The Court finds that this concern is unfounded. The federal government requires the State to include a small amount of risk in its contract with VSHP in order to receive full federal financial participation. (Tr. 610.) Insofar as VSHP passes all of the costs of its services onto the State, the Court finds that there is no genuine possibility that VSHP has an incentive to deny coverage inappropriately. (Tr. 610, 615-16.) Furthermore, the

appeals process described above should provide a strong check on any temptation to restrict medically necessary services.

**G. The Transition Process**

The State and People First have reached an agreement on the terms set forth in the Settlement Agreement, which supplements the terms of the proposed contract amendment to be executed by the State and VSHP.  (Tr. 603-04; Exs. 82, 83.)  The State and VSHP represented to the Court that they will sign this contract upon entry of an order by the Court granting the State leave to terminate its contract with CSN.  (Tr. 117.)  CMS has already conditionally approved the State's application to transition to the Model, provided the State allows individuals to opt out of the Model and choose another MCO, though the State expects that few will choose to opt out. (Tr. 92-93.)

The State anticipates a 120-day transition period in which VSHP will recruit CSN providers as well as hire and train nurse care managers.  (Tr. 130-31.)  Intensive individual evaluation of class members, including at least one home visit, will ensure the continued provision of needed services.  (Tr. 304-05.)  CSN's executive director, Gaye Hansen, also testified that she will personally work to ensure that each class member is adequately transitioned.  (Tr. 740.)  The Court is satisfied that the State has a comprehensive plan for effecting the transition of class members to VSHP.

The State has further represented that it will not finally terminate its contract with CSN until all class members have transitioned to VSHP.  (Tr. 664.)  The State will need to obtain approval from CMS to extend the Model to class members currently residing in ICF/MRs or nursing homes, but expects to obtain this approval quickly.  (Tr. 93-94.)  The State represents

that during the transition it will provide all class members with necessary services, even if wholly through State dollars, until the transition to the Model can be completed.  (Tr. 224.)

## III. CONCLUSIONS OF LAW

### A. Legal Standard

#### 1. Conditions for Approval

The State argues, and the Court agrees, that the appropriate standard for consideration of its proposal is established by the Court's prior orders rather than by the more demanding burden imposed by Federal Rule of Civil Procedure 60(b)(5).  When CSN was created and awarded the Grant Contract, that arrangement was expressly undertaken as a temporary measure "until provisions for such services are appropriately provided for under a new funding vehicle acceptable to the Court."  (Grant Contract at 2.)  Furthermore, the Remedial Order sets the State's fundamental obligation—namely, to provide class members "with adequate and appropriate medical care."  (Remedial Order at 17.)  Given the fact that the parties never intended for CSN to constitute a permanent means of providing class members with care, the State need not establish that VSHP will provide benefits that equal or exceed those currently provided by CSN.  The State need only establish that its proposal will be sufficient to meet that level of medical care and services necessary to protect the substantive due process rights of class members.

Accordingly, the Court rejects the standard advanced by the United States, one which would require the State to show that VSHP will match CSN's services in every particular. Instead, the Court concludes that the State's plan is acceptable because the State has demonstrated, and People First agrees, that VSHP will provide adequate and appropriate medical

care to class members, and the State's development of a funding vehicle like that originally

contemplated warrants the State's requested relief.

### 2. Standard under Federal Rule of Civil Procedure 60(b)(5)

The United States urges the Court to consider Defendants' motion under Rule 60(b)(5) of

the Federal Rules of Civil Procedure, which provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
> . . .
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable[.]

Fed. R. Civ. P. 60(b)(5).  More specifically, the United States argues that the State must show

that it has made a reasonable effort to comply with the Court's prior order, that it should be

relieved of its current obligation, and that the "proposed modification is suitably tailored to the

changed circumstances."  Heath v. DeCourcy, 992 F.2d 630, 635 (6th Cir. 1993).

Even assuming that this is the standard to which the State must be held, the Court finds

that the State has met it.  The equities of each particular case must justify the continued

imposition of an order directing prospective relief.  See Sweeton v. Brown, 27 F.3d 1162, 1164

(6th Cir. 1994) (en banc).  As the Supreme Court recently explained, institutional reform cases

involving consent decrees are particularly amenable to revisions under Rule 60(b)(5) because

circumstances are likely to change in ways that make the continued application of the consent

decree unworkable, and the imposition of orders from the federal judiciary often involve

"sensitive federalism concerns . . . involv[ing] areas of core state responsibilities[.]"  Horne v.

Flores, 129 S. Ct. 2579, 2593 (2009).  Therefore, the courts must apply a "flexible approach" in

evaluating proposals for modifications of consent decrees under Rule 60(b)(5).  Id. at 2494.

First, the State faces a daunting shortfall in revenue that has required the State to reduce expenditures across a number of areas in the budget.  Moreover, the State now possesses an opportunity to access federal moneys which will enable the State not only to service class members, but also to eliminate the disparity created by treating individuals with intellectual disabilities in West Tennessee differently from similarly situated individuals in Middle and East Tennessee.  Thus, the State seeks to create a superior funding vehicle, as originally contemplated at the time of CSN's creation.  These are important considerations for responsible State officials, and the Court gives them great weight.  By ensuring that class members will still receive adequate and appropriate medical care as required by the Court's Remedial Order, while simultaneously placing funding for services to persons with intellectual disabilities across Tennessee (including class members) on a more financially secure foundation and introducing an innovative model of care to those individuals, the State has satisfied the Court that its proposed alteration is suitably tailored.

**B. Objections by the United States**

The United States opposes the State's proposed transition from CSN as the plan is currently presented.  The gravamen of the position taken by the United States is that the State's proposal is not sufficiently definite to supply the Court with adequate assurances that the transition will not adversely affect class members.  The Court appreciates and has considered the concerns raised by the United States, but ultimately finds that they are largely speculative and do not outweigh the benefits of proceeding with the transition to VSHP.  Moreover, the courthouse door remains open should the State falter.

The United States urges the Court to consider the State's proposal in light of the State's past contumacious conduct.  The Court is mindful of the State's past failures, but the evidence

shows that TennCare has, over the years, made marked improvements.  Furthermore, granting leave to terminate the CSN contract does not conclude the Court's oversight of the State's treatment of class members.  To the contrary, the Court will continue to be vigilant in seeing that class members receive adequate and appropriate care from the State, and, to that end, the Court will continue to depend upon the United States and People First for assistance in monitoring the State's provision of care to class members.

The United States further argues that the benefits to be provided by VSHP must equal or surpass the benefits provided by CSN and that the State's proposal fails to demonstrate that VSHP will provide all of the benefits currently available through CSN.  Likewise, the United States argues that the State must assure the Court that there will be a safety net, like CSN, to provide coverage for those services that will not otherwise be covered.  The Court disagrees that this is the appropriate standard for determining the level of care that VSHP must provide.  The Remedial Order requires the State to provide class members with "adequate and appropriate medical care" but does not require the State to supply every conceivable form of care and treatment.  The Court certainly expects that following the transition VSHP will continue to provide the overwhelming majority of benefits that are now provided through CSN.  The Court must, however, allow for some minor differences and variations, such as VSHP's refusal to cover over-the-counter medications.  Such allowances are particularly necessary given the need to respect the judgment of State officials in structuring and managing their own state benefit programs.  Should VSHP fail to deliver "adequate and appropriate medical care" to class members, then the State will not be in compliance with the Court's orders, but the State's proposal at this time indicates that VSHP will provide the requisite level of care.

Another set of concerns raised by the United States arises from the State's failure to be more concrete in its current proposal.  Specifically, the United States asks the Court to require the State to complete its application for CMS approval for the Model, to develop a specific transition plan for class members, to present finalized nurse care manager policies, to recruit CSN's existing medical providers, and to present the Court with a contract executed by the State and VSHP.  Without a finalization of these aspects of the VSHP transition, the United States argues, the State's plan could fail to materialize as described.  Again, the Court appreciates the United States' position.  The State's assurances, however, that it will not terminate its contract with CSN until VSHP is capable of enrolling and providing for class members addresses these concerns.  Moreover, the State has made very specific and earnest representations to the Court of its intention to use its best efforts to establish this specific VSHP program for class members.  In the event the State is unable to establish this program as it has described to the Court in its motion, then CSN is to remain in place.  Because of the State's substantial interest in establishing a program eligible for federal financial participation, however, the State has ample incentive to act with diligence.

## C. Benefits of the Transition to VSHP

The Court concludes that the State has presented a compelling proposal for the transitioning of class members to the Model.  The Court agrees with the judgments of the State officials who testified that the Model's use of nurse care managers for class members in conjunction with a host of innovative technologies to coordinate care through an integrated system presents a genuine opportunity to enhance the provision of treatment and services to class members.  The Court also agrees with the State that, by accessing federal financial participation, the provision of services will be more financially secure, and the Court further agrees with State

officials that it is appropriate for the State to look for opportunities to expand and improve services to all individuals with developmental disabilities throughout Tennessee by tapping into federal funding.  Although a transition from CSN to VSHP certainly will present challenges, the State—along with the plaintiff class representative, People First—has presented sufficient evidence to convince the Court that the transition will not disrupt the care of class members and that VSHP will effectively assume CSN's role by providing class members adequate and appropriate services and treatment.

There can be no disputing that for nearly a decade CSN has performed admirably in its assistance to class members.  CSN's leadership, including its executive director, Gaye Hansen, and David Denegri, its chief financial officer, are to be commended for so capably stepping in to fill a void created by the State's past failures.  The fact that CSN by its very nature must subsist on State dollars alone without the ability to obtain federal financial participation, however, renders the State's relationship with CSN ultimately unsustainable.  Moreover, the State now has an opportunity to create a statewide program that promises to enhance the delivery of care to individuals with intellectual disabilities throughout Tennessee with federal funding.  The Court must give due respect to the judgment of these State officials, especially in light of the difficulties presented by the dramatic shortfall in State revenues resulting from the recent economic downturn.

The Court will monitor the State's progress as it moves forward with the transitioning of class members into VSHP.  The Court expects that it will hear from the parties should any unanticipated obstacles arise which may hinder the enrollment of class members in VSHP from CSN.  Finally, because of the tremendous expertise possessed by Ms. Hansen and Mr. Denegri as to how the needs of these class members are most effectively addressed, the Court invites the

parties to submit their recommendations as to what role these two individuals may assume, should they be willing, after the completion of the transition process.

## IV. CONCLUSION

For the above reasons, Defendants' motion for leave to terminate the State's contract with CSN is granted.  The parties are ordered to meet and confer to establish a meaningful date for a status conference to discuss issues related to the transition of class members.  The parties must submit proposed dates to the Court within thirty (30) days of the entry of this memorandum opinion.

**IT IS SO ORDERED**, this the 27th day of October, 2009.

s/Bernice Bouie Donald
**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT JUDGE**