IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,    )
                              )
    Plaintiff,      )
                              )
v.                         )
                              )   No. 92-2062 D/P
STATE OF TENNESSEE, et al.,   )
                              )
    Defendants, and   )
                              )
PEOPLE FIRST OF TENNESSEE, and )
PARENT-GUARDIAN ASSOCIATION OF )
ARLINGTON DEVELOPMENTAL CENTER, )
                              )
    Intervenors.     )

---

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO SUSPEND AND DISCONTINUE FURTHER ACTIVITY BY THE MONITOR'S OFFICE**

---

Before the court by order of reference is defendants State of Tennessee, et al.'s ("the State") Motion to Suspend and Discontinue Further Activity by the Monitor's Office, filed June 26, 2009. (D.E. 2429.) Intervenor class representative People First of Tennessee ("People First") and plaintiff United States responded to the motion separately on July 13, 2009. The State filed supplemental memoranda in support of its motion on July 10 and August 21, 2009. A hearing on the motion was held on September 3, 2009. On September 16, 2009, People First filed a response in opposition to the State's second supplemental memorandum. The State filed a reply on September 18. After the parties completed

additional discovery relating to the motion, the court conducted a second hearing on the motion on October 30, 2009.

Based upon the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that the motion be denied.

## I.   PROPOSED FINDINGS OF FACT

### A.   Background

This case was initiated by the United States in January of 1992 pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq*.  The United States alleged that the State had violated the constitutional rights of residents of the Arlington Development Center ("ADC"), a State-run intermediate care facility for mentally retarded individuals.  ADC's "population consists primarily of individuals currently assessed as severely or profoundly retarded or developmentally disabled, some of whom have associated physical handicaps, and mental or behavioral problems." United States v. State of Tennessee, 925 F. Supp. 1292, 1296 (W.D. Tenn. 1995).  After trial, the court found serious and pervasive violations of ADC residents' rights to safety, freedom from harm, adequate food, shelter, medical care, freedom from restraint, and adequate habilitation.  The parties negotiated an agreement, the Remedial Order, that the court entered as a consent decree on September 2, 1994.  The Remedial Order provided for the closure of admissions to ADC, improved services for ADC residents, and the

transfer of ADC residents to community placements. Alternative means of delivering necessary care and services to mentally retarded individuals in west Tennessee would replace ADC.

In 1995, the court allowed People First to intervene in the case. The court certified a plaintiff class, consisting of present and former residents of ADC and persons at risk of admission to ADC. People First was appointed class representative. The court approved a Community Plan for placing ADC residents into appropriate community placements in 1997. Currently, ADC remains open, though with a reduced number of residents.

One feature of the Remedial Order was the establishment of a court monitor tasked with the responsibility of ensuring that the State complied with the Remedial Order. Initially Dr. Linda R. O'Neall was appointed as court monitor. She was replaced by Dr. Nancy K. Ray, who has served continuously as the monitor since December 13, 2000. Section XV of the Remedial Order provided as follows:

    B.    The duties of the Monitor will include:

    1.    Conduct on-site reviews at ADC and community placements of former ADC residents covered by this Order at least semi-annually to determine compliance with all provisions of this Order. A reasonable number of expert consultants may be retained to assist the Monitor in these reviews.

    2.    Produce a Compliance Report after each review which contains the results of the on-site review and a summary of the information contained in reports submitted by ADC, including any follow-up action taken by the Monitor. This report should be

-3-

submitted to the Court and both parties.

3.  Be available by phone, correspondence and, when
    needed, in person to the residents and staff of
    ADC, parents and guardians of residents of ADC,
    parties to this litigation, and to the Court.

4.  Review all ADC policies and procedures adopted to
    implement the objectives of this Order and provide
    advice to Defendants regarding the efficacy and
    appropriateness of such policies and procedures.

5.  Undertake special assignments, tasks, and
    investigations as may be requested or ordered by
    the Court.

6.  Prepare and submit to the Court, with a copy to
    Defendants, annual budgets for all costs associated
    with the duties and responsibilities of the Monitor
    and revise these as necessary to accomplish special
    assignments, tasks, and investigations if these are
    required by the court.  The Defendants will have
    fifteen (15) days after receipt to submit any
    comments to the Court.

7.  Submit monthly invoices to the Court for
    reimbursement, with a copy to Defendants.  The
    Defendants will have fifteen (15) days after
    receipt to submit any comments to the Court.

C.  The Monitor will have unlimited access to all
residents, staff, consultants, records (including
individual resident's records), files (other than files
of the ADC attorney), facilities, buildings and premises
subject to this action.  The Defendants will not refuse
any reasonable request by the Monitor for documents or
other information and will permit confidential interviews
of staff. . . .

G.  In instances described in this Order in which the
Monitor may give or withhold approval, the Monitor's
decision must consider the reasonableness, feasibility
and efficacy of the proposed modification in satisfying
the terms of this remedial Order.  In all instances in
this Remedial Plan in which approval by the Monitor is
specified, the Monitor's decision is effective
immediately and will remain in effect unless overturned
by the Court.  If either party disagrees with the

-4-

position taken by the Monitor, the following recourse will be available:

    a.   The dissatisfied party will inform the Monitor in writing of the basis for its disagreement with the Monitor's decision within ten working days; the other party will be given an opportunity to comment within ten working days; the Monitor will reconsider the decision to approve or disapprove and make a final decision within five working days of the receipt of the last set of party's comments.

    b.   If the dissatisfied party disagrees with the Monitor's reconsideration of the approval decision, the party may present the issue to the Court for determination within five working days of the Monitor's final decision. . . .

(Remedial Order, D.E. 338 at 47-49.)   Under Section XIV of the order, the monitor was granted the authority to approve or deny the transfer of residents out of the ADC.   (Id. at 44-45.)

The present motion to suspend the monitor arises from discovery that was conducted by the State in response to contempt proceedings initiated by People First on February 13, 2008.  People First alleged in its Motion for Contempt and Specific Performance that the State failed and refused to perform its obligations required under the Settlement Agreement executed by the parties on May 5, 2006 and approved by the court on February 15, 2007.  (D.E. 2174.)   The contempt proceedings were brought about in part by a letter sent from Dr. Ray to the court, dated February 1, 2008, detailing the alleged failure by the State to meet its obligations ("February 1 Letter").  (D.E. 2234-1.)

The court scheduled a hearing on the contempt motion for July

of 2009.  In preparation for the hearing, the State served document requests on People First that requested copies of People First's relevant communications with Dr. Ray.  People First objected to the document requests, contending that the communications between Dr. Ray and People First were not discoverable.  On March 17, 2009, the State filed a motion to compel discovery, and on June 10, 2009, the District Judge granted the State's motion to compel and ordered People First to produce its communications with Dr. Ray.  In that order, the District Judge noted that "[t]he Court Monitor is not aligned with any party, nor is she an agent or expert for any party.  Rather, the Court Monitor is neutral and acts as an 'agent of the Court.'"  (D.E. 2407.)

Pursuant to that order, People First and Dr. Ray produced their communications.[1]  After reviewing the communications, the State filed the present motion.  The State alleges that numerous emails between People First and Dr. Ray show, at the very least, an appearance of partiality on the part of Dr. Ray.  Based on these communications, the State asserts that Dr. Ray can no longer be considered a neutral agent of the court, and therefore should be removed as the court monitor.

**B.   Emails and Attorney Billing Records**

---

[1]People First was not able to produce all of the responsive communications, as the hard drive that stored emails for one of the attorneys for People First "crashed."  As an alternative to ordering the hard drive restored, the court ordered Dr. Ray to produce responsive emails from her computer system.

The emails that the State presents as evidence of Dr. Ray's appearance of partiality are attached as exhibits to its initial motion (D.E. 2429), supplemental memoranda (D.E. 2466 & 2486), and its Reply in Support of Their Supplemental Motion to Compel Discovery (D.E. 2402). The majority of the emails consist of communications between counsel for People First, Dr. Ray, and third parties (not including the State), in which Dr. Ray shared information or her opinions with these parties:[2]

> (1) November 27, 2007 email from Dr. Ray to Guardian Community Living, copying People First, stating that "I would not sign transition plans where funding consistent with Waiver rules was not apparent," and "hoping that [People First will] take some action within a week";

> (2) December 9, 2007 email from Dr. Ray to People First stating that "I suspect ADC would not close any time soon";

> (3) January 3, 2008 email from Dr. Ray to People First regarding reports prepared by a consultant for the State, stating "I think that you should subpoena these reports";

> (4) January 9, 2008 email from Dr. Ray to People First forwarding complaints about rate cuts, stating "[m]ore information . . . that may be useful";

> (5) January 9, 2008 email from Dr. Ray to People First indicating that the individual who forwarded the complaints "may be a person worth connecting with";

> (6) January 22, 2008 email from People First to Dr. Ray regarding a draft letter to the State proposing to meet and confer on contempt issues ("Meet and Confer Letter"). In the email, People First asks "Dear Nancy . . . We propose to send this letter. We would appreciate your

---

[2]These communications were with one or more attorneys for People First. The court will refer to counsel for People First as simply "People First."

taking a look at it to see if it is wrong anywhere and letting us know so we can send it out." On that same day, Dr. Ray sent People First an email, stating "[t]hank you very much for taking this step. I like this letter. It hits all the main points. I have added a few notes, which relate to additional information about cuts that I have received from providers, as well as my review of the proposed Waiver amendments." Dr. Ray added the following comments to the proposed Meet and Confer Letter:

. . . My concern as well is that the State has not confirmed that this change will stay in place – it seems this may have been a temporary move until the TennCare MCOs can be readied.

. . . The proposed amendments to the Main Waiver actually call for this change.

. . . .

. . . Need to clarify that the only published "draft" protocols address nutrition, behavioral supports, and clinical therapies. No protocol has been released actually addressing residential and day services that are tied to the ICAP. There are also significant cuts related to arbitrarily reducing the rates of persons in single person homes to 2-person rates (although there is no housemate and no evidence of State efforts to assist providers find housemates for these individuals). Special Needs Allowances originally proposed to be ongoing (largely due to the individuals' substantial physical challenges) are being arbitrarily cut. Significantly, the proposed Waiver amendments delete the provision for ongoing SNAs for persons with extreme physical challenges. This change will have significant adverse impact on these individuals who require two to three persons to transfer. It will require providers to cut staff especially in the evening and at night compromising individuals' ability to exit in the event of an emergency in the three minute time frame required. It will also compromise the ability of these individuals to go on community outings, as extra staff are required for transfers. On a related note, changes proposed in the Waiver amendments also limit day service billings for community based day services primarily to community outings. Thus, this change also reflects an additional reimbursement reduction to providers for day services.

(See attached summary of proposed Waiver amendments);[3]

(7) January 22, 2008 email from Dr. Ray to a service provider who had expressed concern about rate cuts, copying People First, stating "[y]ou are right.  We are seeing this here as well.  I think that the Parties will go to court";

(8) February 1, 2008 email from People First to Dr. Ray regarding the February 1 Letter, stating "Good letter. Thanks";

(9) February 13, 2008 email from Dr. Ray to a service provider who had drafted a letter complaining of rate cuts, copying People First, stating "this is a great letter.  I am forwarding it to others.  Thank you for your stand";

(10) February 15, 2008 email from Dr. Ray forwarding to People First an announcement she received of an upcoming meeting with service providers, with one agenda item being "Status of any legal actions filed or contemplated by plaintiffs in Arlington case";

(11) February 21, 2008 email from Dr. Ray to People First regarding an emergency conference of the parties, expressing concern "that I will approve these moves – with the services in their plans – then the services will be cut in 90 days," and asking People First "What do you think?"  People First responded "[w]e have to get this madness in front of the Court," to which Dr. Ray replied "I agree about the Court";

(12) February 27, 2008 email from Dr. Ray to People First forwarding correspondence about public hearings relating to legislative action on the State's cuts in provider rates.  People First responded the following day, "It's already on my calendar and I am planning to attend the Memphis meeting";

(13) April 17, 2008 email from Dr. Ray to People First stating "I need People First to stand strong";

---

[3]Dr. Ray's comments were not incorporated into the final version of the Meet and Confer Letter that was eventually sent by People First to the State.

(14) April 23, 2008 email from Dr. Ray to People First
requesting its "opinion of whether this correspondence
[from the State] is in compliance with the orders in this
case";

(15) September 27, 2008 email from Dr. Ray forwarding to
People First and the United States the State's conveyance
to Dr. Ray of a "post placement monitoring report,"
indicating that Dr. Ray was "very concerned about the
State's position that it can move community class members
where[ver] it likes . . . . [S]ometimes I am not even
notified of these placements until they have already
occurred," and that "I know that there are many matters
to bring before the Court on Friday regarding compliance,
but I hope that you will consider this one as well";

(16) November 13, 2008 email from People First forwarding
its contempt submissions to Dr. Ray, titled "FW: The
Eagle Has Landed," and stating "Nancy, Here they are.
Enjoy.  Jack";

(17) November 26, 2008 email from Dr. Ray forwarding to
the United States and People First an email from the
State attaching documents "as evidence of ADC addressing
Settlement Agreement provisions," and stating "I have not
read these [documents] - but I thought that you might
need them";

(18) December 1, 2008 email from Dr. Ray to People First
pointing to an example of a delayed transition and
stating "I think all of these rates should be guaranteed
for one year.  What do you think?"  People First
responded that "a year seems reasonable," to which Dr.
Ray replied "I plan to ask for [individual statistics] as
soon as I get the supported living rate codes for class
members";

(19) December 5, 2008 email from Dr. Ray forwarding to
the United States and People First an email from the
State attaching reports, indicating "I know that you
cannot manage to find time to read each of these reports,
but I did want to alert you to new tracking of the Grier
appeals (it is near the end).  I also thought you would
be interested in the QA findings for residential and
clinical therapy providers (some where around page 26-35)
. . . . It appears that the State is showing declining
performance but I do not have the data just for West Tn -
so I will ask Pat Nichols for this and let you know.  My

-10-

other concern is that West TN hardly has a fair share of
the Waiver slots overall.  This may just be a factor of
the population, but I am following up on this";

(20) February 19, 2009 email from People First forwarding
to Dr. Ray and others a copy of the court's order denying
the State's motion to vacate, indicating "Dear all, Judge
Donald denied the State's Motion to Vacate in the
Arlington case late yesterday.  Thanks to all for your
support";

(21) February 27, 2009 email from Dr. Ray to People First
pointing out what she viewed as a violation of the
court's orders, stating "I await your advice";

(22) March 4, 2009 email from Dr. Ray to People First
asking whether she should request additional information
from the State.  People First responded "I think I would
ask who and when the appoints are";

(23) March 16, 2009 email from Dr. Ray to People First
inquiring whether "the State had noticed you about
stopping all [pre-admission evaluations] due to funding."
People First responded to Dr. Ray and the United States
on March 23, stating "Ok maybe we need to add this to the
motion";

(24) March 23, 2009 email from People First to Dr. Ray
indicating that the court had set a March 30 hearing and
that she "should be there";

(25) March 31, 2009 email from Dr. Ray to People First
forwarding a service provider's report on service denial,
stating the "report highlights what would happen if CSN
were not available.  I have another similar message,
which I will also forward to you";

(26) April 30, 2009 email from Dr. Ray to People First
proposing to retain a consultant to conduct a literature
review on medical necessity and proposing that People
First "[l]et me know if you have specific questions and
I will try to have them answered in the review.  If, on
the other hand, you are already doing this (or have done
this), please let me know.  I do not want to duplicate
your efforts";

(27) May 5 and May 19, 2009 emails from Dr. Ray to People
First forwarding six attachments, at least one of which

was an article on the topic of "medical necessity."

In addition to the above emails, the State also attached as exhibits to its motion emails that Dr. Ray received from the State, which Dr. Ray later forwarded to People First and/or the United States without the State's knowledge.  According to the State, these emails demonstrate Dr. Ray's willingness to pass along information to the opposing parties "to use against the State":

(28) May 29, 2007 email from Dr. Ray forwarding to People First and the United States an email from the State attaching a "revised draft of the DMRS Housing Costs Subsidy policy," and stating "I hope you will have time to review this.  I find it wholly unacceptable . . . . I am interested in your thoughts";

(29) December 3, 2007 email from Dr. Ray forwarding to People First and the United States an "At Risk Group Update Status Report" and cover message she had received from the State, stating "[w]hen you get a chance would you please call me about this message?";

(30) December 18, 2007 email from Dr. Ray forwarding an exchange she had with DMRS Commissioner Stephen Norris about Dr. Ray's concerns surrounding enrollment of new class members, telling People First and the United States "[t]his may not mean much, but I thought I would pass on the information, as it is";

(31) February 20, 2008 email from Dr. Ray forwarding to People First and the United States an email from the State reporting on "the Health Department's review of the Winfrey Center," and stating "[b]e sure to read the entire report.  The Department's investigations of the complaint filed by Larry is in the second half of the report.  These are very poor 'investigations' - if they could even be called investigations.  Based on this information, I believe that it is essential that the State provide State investigator investigations at the Winfrey Center as soon as possible . . . . I do not think that we can wait on this issue.  I know the issue was raised at the Parties' Meeting, but my recollection is that there was no State commitment.  Thanks for your

help";

(32) February 26, 2008 email from Dr. Ray forwarding "Remedial Order Compliance Data" that she had received from the State, telling People First and the United States "I find many of the internal ADC monitoring findings alarming which is why I am bringing them to your attention";

(33) January 12, 2009 email from Dr. Ray forwarding an exchange between her and the State wherein the State had supplied clarification about the number of at-risk class members referred from hospitals, telling People First and the United States, "[a]s I suspected . . . .";

(34) January 21, 2009 email from Dr. Ray forwarding three attachments reporting on compliance that she had received from the State, telling People First and the United States "[t]he second attachment is particularly of concern, as is the nursing and hearing/speech worksheets on the first attachment";

(35) February 25, 2009 email from Dr. Ray forwarding three attachments reporting on compliance that she had received from the State, telling People First and the United States "FYI - the 2nd and 3rd attachments are the most interesting."

The State also attached emails to its motion that it contends show that Dr. Ray either referred or attempted to refer prospective clients to People First:

(36) January 3, 2008 email from Dr. Ray forwarding to providers People First's letter "putting the State and DMRS on notice of People First's intent to seek emergency injunctive relief," requesting that the providers "Please read this announcement [by People First].  Please also keep me informed of events within your agencies due to the payment reductions, shift in nursing services, repeat ICAPs etc.  It would also be good if you could keep a running record of these concerns";

(37) August 19, 2008 email from Dr. Ray to a provider about problems relating to a particular beneficiary, stating "this is too complicated for any of us to fully understand . . . . [P]lease keep me posted.  I can

-13-

involve People First.  Right now they are dealing with many frustrating 'new' class member cases so I have not referred [Mr. ] . . . .";

(38) October 26, 2008 email from Dr. Ray to a provider, explaining that she was copying People First because "[m]y records show that [the individual at issue] is not a class member, so I will leave this one to [People First]";

(39) November 19, 2008 email from Dr. Ray to a provider stating that People First "has now represented about five folks for appeals of LON downgrades.  He has not lost a single one . . . . [I]t suggests to me that providers should be filing more appeals - . . . as it may be possible for providers to successfully use the same techniques.  I do also want to stress that I am not suggesting that providers should appeal if there is not justification or medical necessity, but when there is - it appears an appeal is warranted."  Earlier in the same email thread, Dr. Ray stated "I have just spoken with Jack Derryberry about Mr. [ ] and he believes you should appeal.  He would be willing to represent Mr. [ ]";

(40) January 15, 2009 email from Dr. Ray to a provider, stating "As for the Grier issues etc., I have passed these onto People First, which is taking them on."

Finally, in addition to these emails, the State also attached as exhibits attorney billing records for People First from January of 2008, which the State argues show that People First and Dr. Ray coordinated with each other in drafting her February 1 Letter to the court.  The entries indicate: "[r]eviewed draft letter from [Dr. Ray] concerning impact of recent policy changes, provided comments on substance and strategy to co-counsel via email"; "[c]ontinuing email and other discussions to prepare for litigation; reviewed final draft on Monitor's letter"; "[c]orrespondence monitor, co-counsel, providers re service

-14-

reductions"; and "[c]ontinuing email dialogue with Dr. Ray, CSN, providers and/or co-counsel concerning budget and service cuts, breach of the 2006 Settlement Agreement; and litigation strategy." (D.E. 2429-16.)   The State claims that "[t]hese billing entries strongly suggest that People First's counsel collaborated behind the scenes with the Monitor on drafting the Monitor's February 1, 2008 letter to the Court that sparked the contempt motion."[4]  (D.E. 2429-2 at 10.)

## C.   Court Monitor's Testimony

Dr. Ray testified at the hearing on the contempt motion before the District Judge from July 6 through July 9, 2009.   In response to cross-examination by the State, Dr. Ray discussed her understanding of her duties as monitor and the proper procedures for fulfilling those duties.   With respect to her duty to ensure compliance with court orders, Dr. Ray testified:

> I certainly corresponded with the Department of Justice to inform the parties of these policies which I felt had an adverse impact on class members and may violate the court orders in the case.   And I've been doing – having that kind of interaction with the plaintiff parties and the state since I started this job.
>
> If I thought something was going awry, particularly

---

[4]In response to the State's motion, People First produced sixteen ex parte emails between Dr. Ray and the State that People First obtained during discovery, suggesting that Dr. Ray's communications with the State have been similar in kind to her communications with People First.   (D.E. 2470-2.)   The court has reviewed each of these emails and finds nothing inappropriate with these communications, as they reflect the State's discussions with Dr. Ray regarding compliance issues.

in a systemic way, I would try to involve the parties. And I would try to have all the parties sit down and discuss the problems. And indeed that was a major focus of quarterly parties' meetings which we've had on a very regular basis. And I would inform the parties for several different reasons, the most important reason was that I was afraid that class members were being harmed.

The second reason was I wanted simply them to be informed of system's changes that were occurring that I thought were adversely affecting class members or would in the future.

And the third was that I was hopeful that they would be able to work effectively with the state to get the policies back into a place where they weren't harmful to class members, and they were in more compliance with the court's orders.

(7/9/09 Tr. at 31-32.)   Dr. Ray was questioned specifically regarding her communications with People First:

Q.   Is it true that you asked [People First] to help by complaining about these issues to the court as part of what subsequently became the contempt motion?

A.   I think I probably did, you know, I asked all the parties to understand and to help with these. I mean, that was the – I mean, I don't just call or e-mail the Department of Justice or People First for no reason. I thought these were serious problems. They evolved into very serious problems.

The second one evolved into such serious problems that the state reversed the policy.

I – I think I would have been negligent not to have informed the parties. I don't run the monitoring shop like I'm a lone person on a horse. I work with the parties.

        . . . .

        . . . I asked him to help with working with the parties on the matter if they chose that – in this case, since my tenure, the parties have tried to work together to solve problems most of the time. Very fortunately we

-16-

have not had to bring a lot of conflicts to the court, and we've been able to solve things and move the system forward.  I think that's a very appropriate way to work.

(Id. at 35-36.)

Further questioning from the State explored the relationship between Dr. Ray, People First, and the United States:

Q.   And you asked counsel for both the United States and for People First to raise your concern with the court, correct?

A.   Right.

Q.   Was it your practice to have plaintiff's counsel present your views to the court in advance of the concerns that you have?

A.   I don't know how many times I may have made this – this specific request.  But if there were going to be a court hearing, and there were any issues of compliance, it wouldn't – I – I don't know how many times I did this . . . I may have only done it this one time, but it might come up again.

Q.   But you didn't tell the state that you wanted the plaintiff's counsel to raise this –

A.   The state knew well that I was sharing this with the plaintiffs and that I was very concerned and that I was considering discussing this with Judge Donald.

(Id. at 98-99.)  Dr. Ray was asked on redirect to clarify the role her work as monitor played in aiding the parties:

Q.   In your experience, has it ever occurred and in any other case that counsel for the plaintiff parties took information that was communicated in reports of the monitor and used it in a motion for contempt or enforcement?

A.   Typically happened.

Q.   It happens often?

-17-

A.   Often.

Q.   And does that mean in such cases that there is a conspiracy or a coordinated effort between the monitor and the plaintiffs to craft a litigation strategy?

A.   No, I actually think it would be almost inevitable, because, you know, the plaintiffs have come together usually on a settlement agreement or in this case there's a court order.   And they, you know, part of the resolution has been the appointment of a monitor to monitor a settlement agreement or to monitor the court order.

     So in – in all of my experience, really the way the plaintiff parties initially hear about a noncompliance concern by the defendants is from the court monitor's reports.

(Id. at 122-23.)

     Dr. Ray was also questioned about the January 22, 2008 email in which she made comments to the proposed Meet and Confer Letter that People First later sent to the State:

Q.   Was it your practice, Dr. Ray, to provide editorial comments on correspondence that People First drafted in connection with this litigation?

A.   It doesn't happen very often, but if they asked me for comments, I would give it.  Just like the state often asks me for comments on drafts of policies or even correspondence with parents or – or others, and I would I would [sic] assist in whatever way that I could.

Q.   Has [plaintiff's counsel] ever asked to you [sic] edit or comment or review draft motions or papers to be filed with the court?

A.   No.

(Id. at 61.)  On redirect, Dr. Ray was further questioned about the draft Meet and Confer Letter:

Q.   [People First] wrote to you and said we would

-18-

appreciate you're taking a look at this letter to see if it is wrong anywhere and letting us know.

What did you understand that he was asking you to do when he asked, take a look at it to see if it is wrong anywhere?

A.   I thought he was asking me to check if it was wrong anywhere.

Q.   In other words, for accuracy?

A.   Yes.

Q.   Factual accuracy?

A.   Yes . . . .

(Id. at 125-26.)

The State also questioned Dr. Ray about her February 1 Letter:

Q.   Am I correct in understanding that counsel for People First reviewed a draft and edited this letter before you submitted it to the court?

A.   You know, I don't know about that.  I don't really recall it.  I want to say that it would not be highly unusual that in sending – before I would notify the – the – Judge Donald about these major issues that I saw in the state policy that I wouldn't ask perhaps them for comment.  So I – I well could have.  I can't remember though that they made any, but maybe they did.

(Id. at 82.)

Finally, Dr. Ray responded to questions regarding the propriety of ex parte contacts with the parties:

Q.   Did you participate in any strategy session with counsel for the plaintiffs in connection with this case?

A.   I don't think so.  Okay.  I – I want to – I – you know, I certainly want to be clear that I have talked with state officials and I have talked to the plaintiffs, and I have talked to the Department of Justice about my concerns that have been happening in view of certain rate

-19-

cuts, changes in policy, and how I thought they would adversely affect class members.

I have clearly – I just feel that I have to say this that, loudly, I have had those discussions five hundred times before with various state officials than I have with the plaintiffs parties.

But I have had those discussions, and I would continue to do that again because I would do anything to prevent the adverse impact on class members.

And if I – and obviously one reason why I have more discussions with various state officials on this topic than – than the plaintiffs was that they are in the best position and the quickest people to fix it.

. . . .

Q.   Dr. Ray, how long have you been the monitor in this case?

A.   Since December of 2000.

Q.   And you had occasion to have private meals with Deputy Commissioner Norris [a representative of the State] in those many years?

A.   Yes, I have. . . .

Q.   . . . And have you extended an invitation to the United States to attend any of these meals?

A.   No, I haven't.

Q.   Does that mean that you are biased against the United States because you did not invite us to these private meetings at which you discussed compliance of court orders?

A.   No.  I thought that actually we would be able to make more progress towards compliance if I met with Mr. Norris.  And often I meet with Ms. Payne and John Kaufman and other senior staff at the same time.  I tried to sort of negotiate it out first with one . . . .

Q.   . . . Is it your understanding that in order to facilitate compliance with the court orders as court

-20-

monitor you must work with, at sometimes, with one party and at sometimes more than one party?

A.   Yes.

(Id. at 75, 131-32.)

## II.  PROPOSED CONCLUSIONS OF LAW

The State contends, and the opposing parties do not dispute, that Dr. Ray is governed by the "appearance of partiality" standard under 28 U.S.C. § 455(a).  That statute provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[5]  28 U.S.C. § 455(a).  Section 455 is designed "'to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.'"  Union Planters Bank v. L & J Dev. Co., 115 F.3d 378, 383 (6th Cir. 1997) (quoting Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865 (1988)).  Under § 455(a), the ultimate question is whether "a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality."  United States v. Hartsel, 199 F.3d 812, 820 (6th Cir. 1999); see also In re Surapaneni, 14 F. App'x 334, 337 (6th Cir. 2001) (stating that "[r]ecusal is mandated . . . only if a reasonable person with

---

[5]Section 455(b)(1) provides a separate basis for disqualification of a judicial officer: "He shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]"  28 U.S.C. § 455(b)(1).

knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned") (quoting <u>Easley v. Univ. of Mich. Bd. of Regents</u>, 853 F.2d 1351, 1356 (6th Cir. 1988)); <u>Reed v. Rhodes</u>, 179 F.3d 453, 467 (6th Cir. 1999) (stating that when confronted with a motion to recuse, "a district judge must apply an objective standard of inquiry: Would a reasonable person knowing all the relevant facts question the impartiality of the judge?").

On its face, § 455 applies only to justices, judges, and magistrate judges – not to court monitors.   The State argues, however, that § 455 applies to Dr. Ray via Federal Rule of Civil Procedure 53.   Rule 53 extends the application of § 455 to special masters by providing that a special master "must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification."   Fed. R. Civ. P. 53(a)(2); <u>see also</u> <u>In re Kempthorne</u>, 449 F.3d 1265, 1269 (D.C. Cir. 2006) (stating that "[w]e have held that a special master is subject to the same ethical restrictions as a judge when the special master serves as the 'functional equivalent' of a judge even though the special master is under a judge's 'control'") (citing <u>Jenkins v. Sterlacci</u>, 849 F.2d 627, 630-32 (D.C. Cir. 1988)).

-22-

Like § 455, Rule 53 does not on its face apply to court monitors.   Moreover, a court monitor is not the functional equivalent of a special master.   See Cobell v. Norton, 334 F.3d 1128, 1144 (D.C. Cir. 2003) (recognizing the "extrajudicial" role of a court monitor, contrasting it with the "judicial" role of a special master, and applying § 455 to the latter).   "Whereas a monitor's 'primary function is to monitor compliance,' a master's role is broader: to 'report[] to the court and, if required, make[] findings of facts and conclusions of law.'"   Cobell v. Norton, 392 F.3d 461, 476 (D.C. Cir. 2004) (quoting Special Project, The Remedial Process in Institutional Reform Litigation, 78 Colum. L. Rev. 784, 827-28 (1978)).   For example, Rule 53(c) provides that, unless the appointing order directs otherwise, a special master may "regulate all proceedings," "if conducting an evidentiary hearing, exercise the appointing court's power to compel, take, and record evidence," and "by order . . . impose on a party any noncontempt sanction provided by Rule 37 or 45, and may recommend a contempt sanction against a party and sanctions against a nonparty."   Fed. R. Civ. P. 53(c).   Dr. Ray possesses none of these powers.

Under the terms of the Remedial Order, Dr. Ray's duties are limited to monitoring compliance.   She is to conduct on-site reviews at ADC, submit compliance reports to the court and both parties, be available to the parties and the court, review all ADC policies and procedures and provide advice to the State regarding

them, undertake special assignments as ordered by the court, and submit annual budgets and monthly invoices for reimbursement. Although she has the authority to approve or disapprove the transfer of residents out of the ADC, this authority does not make her the functional equivalent of a special master. Cf. Juan F. v. Weicker, 37 F.3d 874, 880 (2d Cir. 1994) (finding that the "court monitor" was actually a special master, albeit by another name, because like a special master the "court monitor" had the power to hold meetings, request information, issue reports, hear evidence, and issue findings of fact). Because Dr. Ray is not a special master, she is not governed by Rule 53 or 28 U.S.C. § 455. See Cobell, 392 F.3d at 476 (finding that "a monitor's activities are so unlike those of a rule 53 master that the court should not [designate a monitor a master]" and that "[m]onitoring rarely, if ever, proceeds by the quasi-judicial hearings envisaged by rule 53") (quoting The Remedial Process in Institutional Reform Litigation, supra, at 829).

Nevertheless, as the District Judge has observed in her prior orders, the court monitor "is not aligned with any party, nor is she an agent or expert for any party. Rather, the Court Monitor is neutral and acts as an 'agent of the Court.'" (D.E. 2130 & 2407.) The question, then, is whether Dr. Ray's communications demonstrate that she has aligned herself with any party or is no longer a neutral agent of the court. In making this determination, the

-24-

court bears in mind that although Dr. Ray is not to be aligned with any party, her role as a monitor is significantly different from that of a judge.  She is permitted to engage in ex parte communications with the parties, and is expressly delegated with the duty to "[b]e available by phone, correspondence and, when needed, in person to the residents and staff of ADC, parents and guardians of residents of ADC, parties to this litigation, and to the Court."  (Remedial Order, D.E. 338 at 48).  She is also authorized to "[r]eview all ADC policies and procedures adopted to implement the objectives of this Order and provide advice to Defendants regarding the efficacy and appropriateness of such policies and procedures."  (Id.)  Thus, the fact that Dr. Ray has extensively communicated ex parte with the parties does not raise concerns regarding her neutrality.

Moreover, Dr. Ray's primary responsibility as court monitor is to ensure that the State complies with the court's orders, and by doing so, she protects the rights of the mentally retarded individuals at the ADC.  For that reason, it is understandable that her actions in connection with her duties as court monitor may appear to be adversarial to the State and supportive of People First and the United States.  That Dr. Ray's interests as court monitor overlap with those of People First and the United States does not render her impermissibly aligned with these parties.

In addition, as made clear from the parties' court

-25-

submissions, the parties' course of dealing with Dr. Ray over the years has resulted in her role as court monitor evolving somewhat into that of a facilitator and advisor.  She regularly communicates ex parte with representatives of all parties, provides them with guidance, advice, and criticism, and works with the parties to try to solve problems with minimal court intervention – all in an effort to address issues that arise on a day-to-day basis in an efficient, expeditious, and cost-effective manner.

For these reasons, conduct that would certainly raise concerns if engaged in by a judge would not necessarily raise concerns if engaged in by Dr. Ray.[6]  With that in mind, the court has carefully reviewed the emails, billing records, and relevant portions of Dr. Ray's July 9, 2009 hearing transcript, and concludes that she should not be suspended as court monitor.

---

[6]The parties have not cited, and the court in conducting its own research could not find, any cases analogous to the present case. The cases cited by the State are distinguishable from the case at bar.  See In re Kempthorne, 449 F.3d at 1270 (finding that a special master responsible for investigating misconduct charges brought by a corporation against the Department of the Interior should have recused himself after he hired a former employee of the corporation to assist the special master in preparing reports about the investigation); In re Kensington Int'l Ltd., 368 F.3d 289, 309 (3d Cir. 2004) (finding that a judge should have recused himself because his court-appointed advisors had conflicts of interest); Edgar v. K.L., 93 F.3d 256, 261-62 (7th Cir. 1996) (disqualifying a judge because the panel of court-appointed experts had been influenced by secret submissions from advocacy groups and counsel supporting plaintiffs in other litigation); United States v. City of Detroit, No. 03-72258 (E.D. Mich. July 24, 2009) (copy attached to State's Second Supplemental Mem., D.E. 2486-3) (dismissing court monitor who had an inappropriate, possibly romantic, relationship with the then-Mayor of Detroit).

The vast majority of the emails relied upon by the State do
not raise concerns regarding Dr. Ray's neutrality.  As for emails
drafted by Dr. Ray, these emails reflect Dr. Ray's support of plans
and policies that are favorable to the class (and thus favorable to
People First and the United States); her support of service
providers who have expressed concern over rate cuts and other
adverse action by the State; her disappointment in the State's
actions that she perceived to be contrary to the best interest of
the ADC residents; and emails where Dr. Ray has passed along
information to People First and/or the United States that are of
questionable relevance to Dr. Ray's neutrality.  As for emails that
were sent to Dr. Ray or on which Dr. Ray was copied with other
recipients, while the emails may reflect the opinions of the
sender, the court does not find that these emails show that Dr. Ray
is impermissibly aligned with People First or is not neutral.  As
for emails sent from the State to Dr. Ray that she forwarded to
People First and the United States, while the State may not be
pleased that Dr. Ray notified opposing counsel about concerns she
had with the State's actions, this does not demonstrate that she is
not acting as a neutral agent of the court.  With respect to the
emails sent from Dr. Ray that the State contends show she either
referred or attempted to refer prospective clients to People First,
the court does not find that these emails reflect an impermissible
bias in favor of People First, as it appears that Dr. Ray was

-27-

attempting to provide a resource for individuals who are not class members.  Although some of Dr. Ray's actions may arguably exceed the scope of her duties under the Remedial Order, they do not provide a basis to suspend her for bias.

The State argues that the January 22, 2008 email correspondence between Dr. Ray and People First regarding the proposed Meet and Confer Letter shows that Dr. Ray is aligned with People First.  The court notes that the email correspondence began with People First simply asking Dr. Ray to review the letter and that "[w]e would appreciate your taking a look at it to see if it is wrong anywhere and letting us know so we can send it out."  In response, Dr. Ray provided People first with her comments and suggested adding other, more detailed information.  The Remedial Order directs the court monitor to "provide advice to Defendants regarding the efficacy and appropriateness of [all ADC] policies and procedures," and although providing advice to People First regarding the State's policies and procedures is not expressly provided for in the order, the court does not view Dr. Ray's willingness to share her views with the other parties in this case to be indicative of partiality.

Finally, the State contends that in connection with the February 1 Letter to the court, Dr. Ray sent a draft copy to People First to review and provide comments, without notifying the State and without giving the State an opportunity to provide comments.

-28-

Although it appears from Dr. Ray's contempt hearing testimony and People First's billing records that Dr. Ray, in fact, sent a draft copy of the letter to People First for comment, it also appears, based on her testimony that she had been having ongoing discussions with the State regarding all of the issues raised in her letter, that she had attempted unsuccessfully to convince the State to change its views, and that none of the problems she raised in her letter should have come as a surprise to the State. Perhaps, in retrospect, Dr. Ray should have sent a draft of her letter to all parties instead of only People First. However, the court does not believe that her decision to send a draft of the letter only to People First demonstrates that she is not a neutral agent of the court.[7]

### III.   RECOMMENDATION

For the reasons above, the court recommends that the motion be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

February 16, 2010
Date

---

[7]As the court has noted above, perhaps some of the monitor's actions may have exceeded the scope of her duties under the Remedial Order. For purposes of the present motion, the court need not address this issue. However, going forward, the parties might consider amending the Remedial Order to more clearly define the scope of the court monitor's duties and authority.

NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).   FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**